David R. JONES, Appellant,

v.

UNITED STATES of America,
Appellee.

Willie L. SHORT, Jr., Appellant,

v.

UNITED STATES of America,
Appellee.

Arthur L. JONES, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 17688, 17690, 17689, 17691, 17692.

United States Court of Appeals
District of Columbia Circuit.

Argued April 29, 1964.

On Rehearing in banc Decided
July 16, 1964.

Prettyman, Wilbur K. Miller, Dana-her and Bastian, Circuit Judges, dissented.

Mr. Jerome J. Dick, Washington, D. C. (appointed by this court) for appellants in Nos. 17688, 17690 and 17692.

Mr. Gerry Levenberg, Washington, D. C., with whom Mr. Harris Weinstein, Washington, D. C. (both appointed by this court) was on the brief, for appellant in Nos. 17689 and 17691.

Mr. John A. Terry, Asst. U. S. Atty., for appellee. Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker, Joel D. Blackwell, Gerald A. Messerman, Asst. U. S. Attys., and Robert A. Levetown, Asst. U. S. Atty., at the time the brief was filed, were on the brief for appellee. Messrs. Barry I. Fredericks, B. Michael Rauh and William C. Weitzel, Jr., Asst. U. S. Attys., also entered appearances for appellee. Mr. Judah Best, Asst. U. S. Atty., at the time the brief was filed, also entered an appearance for appellee.

Before BAZELON, Chief judge, EDGERTON and PRETTYMAN, Senior Circuit Judges,* and WILBUR K. MILLER, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER, WRIGHT, and McGOWAN, Circuit Judges.

EDGERTON, Senior Circuit Judge:

Judges Bazelon, Fahy, Washington, Wright, and McGowan concur in parts I, II, and VI of this opinion. These parts are the opinion of the court. Judges Bazelon, Fahy, and Wright join in parts III, IV, and V, which are not the opinion of the court.

Willie Lee Short and David Jones appeal from convictions of assault with intent to rob. D.C.CODE § 22–501. Short, David Jones and Arthur Jones appeal from convictions of robbery. D.C.CODE § 22–2901. The crimes were alleged to have occurred on August 3 and July 28, 1962.

A warrant for Short's arrest was issued in the District of Columbia in August, 1962. On Thursday, September 13, police in Raleigh, North Carolina, arrested him on a state charge, notified the District of Columbia police, and got from Short a signed "waiver of extradition." On Saturday, September 15, Detective Sergeant O'Bryant of the District of Columbia police arrived in Raleigh with the warrant and wrote on it: "Arrested 9–15–62 10:30 AM Sheriff's Office Raleigh N.C. Det. Sgt. Tilmon B. O'Bryant."

By 11:00 AM O'Bryant had begun to question Short. At first he denied all guilt, but according to O'Bryant's testimony on cross-examination he "admitted his participation" within 2 or 3 minutes. O'Bryant questioned him about an hour and a half or two hours before he began making confessions which O'Bryant typed.

On Sunday, September 16, O'Bryant brought Short to the District of Columbia. On Monday morning Short was taken for the first time before a committing magistrate, who appointed a lawyer to represent him. The lawyer talked with him five or ten minutes and told the judge he waived preliminary hearing. Short did not know what this meant. He could not make bond and was taken back to jail. Fifteen days later, on October 2, he was taken before a grand jury and questioned. The confessions typed in North Carolina were read and he confirmed them. Indictments followed. The confessions were admitted in evidence at the trials.

I

■ Rule 40(b), F.R.CRIM.P., requires that a person "arrested upon a warrant issued in another state * * * shall be taken without unnecessary delay before the nearest available commissioner or a nearby judge of the United States in the district in which the arrest was made" who "shall inform the defendant of the charge against him, of his right to retain counsel and of his right to have a hearing or to waive a hearing by signing a waiver before the commissioner or judge. The commissioner or judge shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him, shall allow him reasonable opportunity to consult counsel and shall admit him to bail as provided in

* Sitting by authority of 28 U.S.C. § 46 as amended Nov. 13, 1963.

these rules."[1] There was no compliance with this Rule.

When O'Bryant, in the Sheriff's office in Raleigh, wrote on the warrant: "Arrested 9–15–62 10:30 AM", it was his duty to take Short "without unnecessary delay" before a magistrate who would advise him of his rights. Instead, O'Bryant questioned him at length. O'Bryant "did not see any need to take him before a committing magistrate in the State of North Carolina" and made no effort to do so. In oral argument of this appeal the government conceded that Rule 40(b) should have been and was not complied with.

Though Short had been in the custody of state officers, at some time he became O'Bryant's prisoner. There is no evidence that this time was later than 10:30 AM, when O'Bryant wrote "Arrested" on the warrant, or that the state officers who then allowed him to question Short in violation of law would not have allowed him to take Short before a magistrate in compliance with law. He testified that the state officers were "most hospitable".[2] "Unnecessary delay", therefore, began not later than 10:30 AM and included the time some two hours later when O'Bryant began typing the confessions that were introduced in evidence at the trials.

Some delay for the purpose of questioning an arrested person to determine whether he should be held or released has sometimes been thought "necessary". But this assumes some appropriate purpose for the delay other than obtaining a confession, as in Metoyer v. United States, 102 U.S.App.D.C. 62, 250 F.2d 30 (1957), and Heideman v. United States, 104 U.S.App.D.C. 128, 259 F.2d 943 (1958), where "inquiry to make sure that the police were not charging the wrong persons" (Heideman, 104 U.S. App.D.C. at 130, 259 F.2d at 945) seemed appropriate. It has nothing to do with this case. O'Bryant did not go from the District of Columbia to North Carolina with the arrest warrant in his pocket for any such purpose. He well knew that Short was to be held. He had no authority to release him. Moreover O'Bryant testified that Short made an oral confession within "two or three minutes." The government does not challenge the trial judge's findings that the purpose of O'Bryant's interrogation of Short was "to get a confession out of him." Before he began to write, he subjected Short to an hour and a half or two hours of questioning for the purpose of getting the confessions which O'Bryant typed and which were introduced in evidence. The time lag occurred not while the statements were being typed but before the typing began. There is nothing to take this case out of the McNabb-Mallory rule that "a confession is inadmissible if made during illegal detention due to failure promptly a carry a prisoner before a committing magistrate". Upshaw v. United States, 335 U.S. 410, 413, 69 S.Ct. 170, 93 L.Ed. 100 (1948). Short's confessions should not have been admitted in evidence.[3] His convictions must therefore be reversed.

1. This is practically identical with the provisions of Rule 5(a), F.R.CRIM.P., regarding persons arrested on a domestic warrant.

2. Officers testified they were willing to let Short go because the District of Columbia charges were more serious than the state charge.
   United States v. Coppola, 281 F.2d 340 (2d Cir. 1960), aff'd per curiam, 365 U. S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (1960), upheld admission of confessions obtained by the FBI while the defendant was a state prisoner, but "the apprehension and detention were exclusively for state crimes" and there is no suggestion that the FBI had or asserted any control over the prisoner. Moreover, the Court of Appeals said that if the arrest and detention by local police had been "for the purpose of enabling federal officers to question the defendants concerning the bank robberies for a period of time forbidden to federal officers by Rule 5(a) of the Federal Rules of Criminal Procedure, admissions thus obtained would properly be excluded." 281 F.2d at 344.

3. That Short had been in state custody does not mean that O'Bryant was mistaken in his belief that he arrested Short. In substance if not in form O'Bryant said

## II

■ In each trial, Short's confession was read to the jury with "name" or "named person" substituted for the names of the Joneses. But as the Supreme Court has said, other testimony may make it impossible for such a device to divert incrimination from the confessor's co-defendants to "an anonymous nobody". Stein v. New York, 346 U.S. 156, 194, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953). In the present case, other testimony about David and Arthur Jones made it obvious that the omitted names were theirs. Short's illegally obtained confessions therefore prejudiced them as well as him.

As against a confessor's co-defendants, the confession is inadmissible hearsay.

to the state officers "If you will let him go I will arrest him."

The arrest was legal. A crime committed in the District of Columbia is a federal crime for purposes of the removal statute. United States v. Wimsatt, 161 F. 586 (S.D.N.Y.1908); United States v. Campbell, 179 F. 762 (E.D.Pa.1910). It is "defined by an act of Congress, a violation of the act is of necessity an offense against the United States, and such offenses have uniformly been prosecuted as such." Parker v. United States, 3 F.2d 903, at 904 (9th Cir. 1925).

But the legality or illegality of the arrest is irrelevant. Even if the arrest had been illegal, that would not have relieved the arresting officer of the obligation to take Short promptly before a magistrate. The status in North Carolina of the warrant and of O'Bryant is therefore irrelevant.

This court has sometimes held that if a prisoner confesses as soon as he is arrested and the police immediately reduce his confession to writing instead of taking him immediately before a magistrate, the written as well as the oral confession may be admissible in evidence. Those cases were not reviewed by the Supreme Court. This court in banc does not now consider overruling these cases because they do not cover this case. They emphasize both the promptness with which the written confession was obtained and, with the possible exception of Porter v. United States, 103 U.S.App.D.C. 385, 258 F.2d 685 (1958), cert. denied, 360 U.S. 906, 79 S. Ct. 1289, 3 L.Ed.2d 1257 (1959), the promptness with which the prisoner was then taken before a magistrate. In Metoyer v. United States, 102 U.S.App.D.C. 62, 250 F.2d 30 (1957), the writing of the confession began "within 20 or 25 minutes after the first voluntary statement" and the prisoner was taken to a magistrate so quickly that he claimed "undue speed" upset his presentation. In Heideman v. United States, 104 U.S.App.D.C. 128, 259 F.2d 943 (1958), cert. denied, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959), the police did not even take the time to reduce the oral confession to writing. In Muschette v. United States, 116 U.S.App. D.C. 239, 322 F.2d 989 (1963), judgment vacated on other grounds, 378 U.S. 569, 84 S.Ct. 1927, 12 L.Ed.2d 1039 (1964), immediate steps were taken to locate a typist, and the entire time from arrest to presentment was only an hour and twenty minutes.

In the present case, O'Bryant testified that Short at first denied the charges; O'Bryant continued to question him and "within two or three minutes", according to O'Bryant's testimony on cross-examination, Short confessed; in what detail, if any, does not appear. On direct and re-direct examination, O'Bryant testified only to the later written confessions which he typed. When the alleged oral confessions were made he did not attempt to reduce them to writing but continued to "talk" to Short for an hour and a half or two hours before he began to type. At one point he testified that he "questioned" Short for two hours before he began to type. At another point he said Short told the story in his own words and then O'Bryant asked for written statements. When he began to write, he asked questions and typed answers in narrative form.

Little would be left of *Mallory* if the police, after getting a quick confession, could spend hours discussing the case and then get an admissible written statement.

The present case resembles three recent cases in which the police got immediate oral confessions and then continued to seek further evidence from the prisoner before producing him before a magistrate, either by taking him to the scene of the crime, Jones v. United States, 113 U.S. App.D.C. 256, 307 F.2d 397 (1962); Naples v. United States, 113 U.S.App.D.C. 281, 307 F.2d 618 (1962), *(in banc)*, or by questioning him about related crimes, Coleman v. United States, 115 U.S.App. D.C. 191, 317 F.2d 891 (1963). This court held that the oral confessions were admissible but the evidence afterwards acquired should have been excluded because of unnecessary delay.

In accordance with time-honored custom,[4] the trial judge cautioned the jury that a confession is evidence only against the confessor. But no jury can forget one defendant's confession in considering the case of a co-defendant whom it implicates. Speaking for the Second Circuit, Judge Learned Hand called the time-honored custom a "subterfuge". He said: "There is no reason why the prosecution if it chooses to indict several defendants together should not be confined to evidence admissible against all." But he said the "rule probably furthers, rather than impedes, the search for truth, and this perhaps excuses the device which satisfies form while it violates substance; that is, the recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody else's." Nash v. United States, 54 F.2d 1006, 1007 (1932). As this statement suggests, the theory behind the subterfuge probably is that a confession is such valuable evidence against the confessor that sound policy permits its use at a joint trial, despite the harm it does to the confessor's co-defendants who ought to have the protection of the hearsay rule. In 1957 the Supreme Court sustained a co-defendant's conviction where (1) the confession was admissible against the confessor, (2) it was impractical to delete references to the co-defendant, (3) there was enough other evidence against him to sustain his conviction, and (4) the time-honored admonition to the jury was clearly and repeatedly given.[5]

Since Short's confessions were not admissible even against him, there is no reason whatever for permitting them to prejudice his co-defendants. And the purpose of the *McNabb-Mallory* rule, to discourage prolonged questioning in order to get a confession before the suspect is told of his rights by a magistrate, would be defeated as much by allowing a wrongly obtained confession to be used against co-defendants as by allowing it to be used against the confessor himself. It follows that the convictions of the Joneses as well as the convictions of Short should be reversed.

In Anderson v. United States the Supreme Court held that admission in evidence of illegally obtained confessions of some defendants vitiated the convictions of all. One ground of the decision was that the judge's charge allowed the jury "to assume that in ascertaining the guilt or innocence of each defendant they could consider the whole proof made at the trial." 318 U.S. 350, 356–357, 63 S.Ct. 599, 87 L.Ed. 829 (1943). But in the later case of Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945), in sustaining a *state court* conviction where a co-defendant's coerced confession had been introduced at a joint trial, the Supreme Court distinguished *Anderson* primarily on the ground that it dealt with "a criminal proceeding in a federal District Court over which we have more control than we do over criminal trials in the state courts", and only secondarily ("Moreover") on the ground that it involved an erroneous instruction to the jury. 324 U.S. 401, 411, 412, 65 S.Ct. 781 (1945). Since the present appeals, like *Anderson*, involve "a criminal proceeding in a federal District Court", the co-defendants' convictions should be reversed as in *Anderson*, not affirmed as in *Malinski*.

### III

We said in 1955: "No doubt it would be a boon to prosecutors if they could summon before a Grand Jury a person against whom an indictment is being sought and there interrogate him, isolated from the protection of counsel and presiding judge and insulated from the critical observation of the public. But there is a serious question whether our jurisprudence, fortified by constitutional declaration, permits that procedure."

---

4. WIGMORE, EVIDENCE, 3d ed., §§ 1076, 1079, cites cases dating from 1668.

5. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957).

Justices Frankfurter, Black, Douglas and Brennan dissented. *Cf.* Kramer v. United States, 115 U.S.App.D.C. 50, 317 F.2d 114 (1963).

Powell v. United States, 96 U.S.App. D.C. 367, 372, 226 F.2d 269, 274. We think this question should be answered in the negative. We cannot reconcile that procedure, which was used in this case, with the Fifth Amendment guarantee that "No person shall be compelled in any criminal case to be a witness against himself."

Like a trial, a grand jury investigation of a crime is "a criminal case" at which incriminating questions need not be answered. Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). At a trial, putting the accused on the witness stand without his consent and asking him anything at all would violate his constitutional privilege against self-incrimination.[6] We think taking him before the grand jury without his consent and asking him anything violates his privilege. This is perhaps implicit in the Supreme Court's action in Lawn v. United States, *infra*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). If it is not and ours is a minority view,[7] as the New York Court of Appeals said in a different connection "We may as well disregard the weight of authority elsewhere and start with a rule of our own, consistent with practical experience. * * * Consistency requires us to go forward or to go back. We cannot go back. * * * The present distinction is indefensible." Campbell v. New York Evening Post, 245 N.Y. 320, 157 N.E. 153, 52 A.L.R. 1432 (1927).

In Fisher v. United States, 328 U.S. 463, 476, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946), the Supreme Court said: "Matters relating to law enforcement in the District are entrusted to the courts of the District. Our policy is not to interfere with the local rules of law which they fashion, save in exceptional situations were egregious error has been committed." The "Court, in its decisions, and Congress, in its enactment of statutes, have often recognized the appropriateness of one rule for the District and another for other jurisdictions so far as they are subject to federal law." Griffin v. United States, 336 U.S. 704, 712, 69 S.Ct. 814, 93 L.Ed. 993 (1949). The courts of the District of Columbia should not content themselves with enforcing the minimum standards which the Constitution requires. They should also set for the Nation an example of respect for the rights of citizens.

Mere interrogation before a grand jury may harm the accused as much as mere interrogation at a trial. Even if he makes "no direct incriminating statement, there is no way to know whether in fact his appearance was incriminating in the minds of some or all the members of the Grand Jury." United States v. DiGrazia, 213 F.Supp. 232, 234 (N.D.Ill. 1963). His having been brought there may arouse suspicion. His manner and voice may arouse suspicion. Because grand jury investigations are secret, as we said in *Powell* he is "isolated from the protection of counsel and presiding judge and insulated from the critical observation of the public." Though he may be unqualified, as Short was, to decide for himself what questions to answer, he must decide at his peril. If he answers incriminating questions he may make it certain, as Short did, that he will be indicted. And testimony before the grand jury may be used, though Short's was not, to impeach his testimony at trial.[8] If he refuses to testify at all, or to answer some questions on the ground that answers might incriminate him, the grand jury may draw conclusions. If he refuses to answer questions that are not incriminating, he may be guilty of contempt. The prosecutor read aloud the confessions that O'Bryant had typed, and asked Short if they were his and were true. He acknowledged that they were. Apparently little other evidence

---

6. This is said to be "universally held." 8 WIGMORE, EVIDENCE, McNaughton rev. 1961, § 2268, p. 406.

7. See 38 A.L.R.2d 237, 238 (1954); United States v. Cleary, 265 F.2d 459 (2d Cir.

1959), cert. denied, 360 U.S. 936, 79 S.Ct. 1458, 3 L.Ed.2d 1548 (1959).

8. 8 WIGMORE, EVIDENCE, 3d ed., § 2363, p. 727.

was presented,[9] but the grand jury indicted him. He was plainly prejudiced by the interrogation.

Short did not validly waive his right not be taken to the grand jury and questioned. " 'Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). A waiver is not valid unless it is intelligently made. An "intelligent waiver * * * must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." *Ibid.* Short is an indigent young Negro whose schooling stopped with the third grade. *Cf.* Reece v. Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Williams v. Huff, 79 U.S.App.D.C. 326, 146 F.2d 867 (1945). He cannot read and can barely write. The police found it necessary to read and explain to him twice a simple form for waiving extradition. No one told him, before he was taken to the grand jury, what a grand jury was or what his rights before it would be, although the committing magistrate and the police had told him in general terms that he need not "incriminate himself." Even if the government officers had explained things

to him as fully as possible, he would still have been incapable of an intelligent waiver without the advice of counsel. *Cf.* Moore v. Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167 (1957). Even an "intelligent, mentally acute" defendant should not "be dependent upon government agents for legal counsel and aid, however conscientious and able those agents may be." Von Moltke v. Gillies, 332 U.S. 708, 720, 725, 68 S.Ct. 316, 92 L.Ed. 309 (1948).

Moreover, in our view Short gave no consent, not even an unintelligent one, to be taken before the grand jury on October 2. His actual state of mind is irrelevant, since a state of mind that is not expressed or implied by words or conduct has no legal effect. He was not asked on October 2, or even shortly before that day, whether he wanted to go before the grand jury.[10] He was taken in handcuffs. He had been in jail almost three weeks. Prisoners frequently acquiesce in orders or suggestions, and "true consent, free of fear or pressure is not so readily to be found." Judd v. United States, 89 U.S.App.D.C. 64, 66, 190 F.2d 649, 651 (1951).[11]

When Short was actually facing the grand jury it was too late for any warning to mean much. The warning the prosecutor gave him in the grand jury

9. Little other evidence was available. In one case but not in the other, the police had Short's fingerprints. David Jones had surrendered, but he had made no confession. Even at the trials, the government relied heavily on Short's confessions. The principal corroboration was provided by a co-defendant, Johnson, who confessed before the trials but after the indictments and was rewarded for his testimony by dismissal of the robbery indictment against him and acceptance of a guilty plea to the indictment for attempted robbery.

10. Detective O'Bryant testified that on September 16, on the way from North Carolina to the District of Columbia, he asked Short whether he wanted to testify before the grand jury and Short said he did. Short denied this. We accept O'Bryant's testimony. But if, as Short claimed, he did not know what a grand jury was, he may well have thought

O'Bryant meant a trial jury. Probably many laymen think all juries are trial juries. In any case, willingness on September 16 is not willingness on October 2. There is nothing to show that anyone even thought on October 2 that Short was then willing to be taken to the grand jury and interrogated.

11. At a hearing on a motion to dismiss the indictments Short said, when pressed, that when he was before the grand jury he wanted to testify because he "knew he hadn't did anything." But he made no attempt to exculpate himself before the grand jury. Instead, he told the grand jury that his signed statements which were read to him were true. The motion to dismiss and a motion to suppress the confessions were denied. In Moon v. United States, 115 U.S.App.D.C. 133, 317 F.2d 544 (1962), no timely motions were made.

room would have been inadequate to protect his rights even if Short's presence had been voluntary. The prosecutor told him he was "before the Grand Jury" but did not tell him in what business the grand jury was engaged. The prosecutor told him he need not answer questions and that answers could be used against him "at any future trial", but did not tell him the grand jury would use his answers to decide whether to indict him. The prosecutor did not tell him he was entitled to consult counsel before being questioned.

## IV

Short's Sixth Amendment right "to have the Assistance of Counsel for his defense" was withheld. The right to counsel does not begin at trial. If it began then it would often be worth little, for cases are often lost at earlier stages. The accused "requires the guiding hand of counsel at every step in the proceedings against him." Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932).[12] This is a constitutional principle, not a mere factual observation. Accordingly the accused is entitled to counsel at arraignment. Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961); Evans v. Rives, 75 U.S.App.D.C. 242, 250, 126 F.2d 633, 641 (1942). He is entitled to counsel at preliminary hearing, at least if he is then called upon to plead. White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); Wood v. United States, 75 U.S.App.D.C. 274, 128 F.2d 265, 141 A.L.R. 1318 (1942). He is entitled to counsel on appeal. Ellis v. United States, 356 U.S. 674, 78 S.Ct. 974, 2 L.Ed.2d 1060 (1958).

Congress has implemented the constitutional right to the assistance of counsel. The DISTRICT OF COLUMBIA CODE provides in § 2–2202 that the Legal Aid Agency "shall make attorneys available to represent indigents in criminal proceedings in the United States District Court for the District of Columbia and in preliminary hearings in felony cases", and that each court "will make every reasonable effort to provide assignment of counsel as early in the proceedings as practicable." Rule 44 of the FEDERAL RULES OF CRIMINAL PROCEDURE provides that "If the defendant appears in court without counsel, the court shall advise him of his right to counsel and assign counsel to represent him at every stage of the proceeding unless he elects to proceed without counsel or is able to obtain counsel." Criminal Rule 24 of the Court of General Sessions is in the same words.

Indictment is a crucial "step in the proceedings against" the accused. The right which he has at other crucial stages does not jump the time just before indictment. In this case the committing magistrate, a judge of the Court of General Sessions, had appointed counsel for Short in accordance with that court's Rule 24.[13] When Short was about to be taken to the grand jury for questioning he badly needed to consult his counsel. But the government prevented him from doing so, by not informing counsel that Short was to be questioned.

The committing magistrate determines, after a preliminary hearing unless the accused waives hearing, whether he should be held to await action of the grand jury. It is counsel's duty "to represent him at every stage of the proceeding" as Rule 24 requires. Any practice of assigning a lawyer for the few moments the accused is before the magistrate and no more would mock the requirement of assistance of counsel. The appointment must continue until the prosecution is terminated or other counsel is appointed, which should normally be before arraignment. Except in rare emergencies no lawyer should be asked to accept a truncated appointment. There is no contention that Short's counsel, either with or without notice to

---

12. *Cf.* Gideon v. Wainwright, 372 U.S. 335, 343, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

13. Short never saw this lawyer again. *Cf.* Trilling v. United States, 104 U.S.App. D.C. 159, 177–178, 260 F.2d 677, 695–696 (1958).

Short, obtained leave of court to withdraw. Unauthorized withdrawal cannot be tolerated. Judge Prettyman agrees with the views expressed in this paragraph.

The Sixth Amendment right to counsel is violated if a confession obtained by questioning an uncounseled defendant after indictment is used against him in a United States court. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).[14] In that case, three Justices pointed out in a dissenting opinion that the Court's reasoning "would seem equally pertinent to statements obtained at any time after the right to counsel attaches, whether there has been an indictment or not * * *" (377 U.S. at 208, 84 S.Ct. p. 1204). In New York, a defendant's voluntary statement obtained in the absence of counsel after preliminary hearing and before indictment has been held inadmissible. People v. Meyer, 11 N.Y.2d 162, 227 N.Y.S.2d 427, 182 N.E.2d 103 (1962). The Fifth Circuit has said: "No one can dispute the truth of Professor Chafee's statement, 'A person accused of crime needs a lawyer right after his arrest probably more than at any other time.' It would not be unreasonable therefore to recognize an accused's right to counsel from the moment of arrest." Lee v. United States, 322 F.2d 770, 778 (1963). The New York Court of Appeals now recognizes that right. Judge Fuld said for that court, "One of the most important protections that counsel can confer while his client is being detained by the authorities is to preserve his client's privilege against self-incrimination and prevent the deprivation of this and other rights which may

ensue from such detention." People v. Donovan, 13 N.Y.2d 148, 243 N.Y.S.2d 841, 193 N.E.2d 628 (1963).

Finally, in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the Supreme Court held that in the particular circumstances of that case the accused was constitutionally entitled to counsel during police questioning before indictment. Though the Court's express ruling was no broader than the facts, which were different from the facts of our case, the underlying principle that the right to counsel begins before indictment applies here.

By failing to inform counsel of the impending examination, the prosecution deprived Short of his assistance at a crucial time and greatly to Short's prejudice. Counsel might even have succeeded in preventing him from being taken before the grand jury. In general, "secret, ex parte interrogations of defendants are not conducted when a prisoner has counsel. * * * This practice carries secret questioning to the point of invidious discrimination against indigent defendants." Lee v. United States, 322 F.2d 770, 777 (5th Cir. 1963). Though counsel could not have gone before the grand jury with Short he could have given him valuable advice in advance as to what questions, if any, he should answer when he was taken there. It is most unlikely that Short would have repeated his former confessions there if he had been counseled. Counsel might have advised him that those confessions were illegally obtained and could not be used in any trial.[15]

## V

Since an indictment obtained in violation of federal constitutional rights must

---

14. The New York courts have long held that counsel must be available whenever the accused is questioned after indictment. People v. Di Biasi, 7 N.Y.2d 544, 200 N.Y.S.2d 21, 166 N.E.2d 825 (1960); People v. Waterman, 9 N.Y.2d 561, 216 N.Y.S.2d 70, 175 N.E.2d 445 (1961).

15. Judge Wright would dismiss the indictment for the following reason: where, as

here, an uncounseled accused, charged and held for the grand jury, is interrogated before the grand jury considering his indictment, that grand jury is without jurisdiction to indict the uncounseled accused. Compare Johnson v. Zerbst, 304 U.S. 458, 467–468, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

be dismissed,[16] at least where substantial prejudice resulted, the violations of Short's privilege against self-incrimination and of his right to the assistance of counsel make it necessary to dismiss the indictments against him. This is quite independent of the fact that his written confessions, which were read to the grand jury, were obtained in violation of the *McNabb-Mallory* rule.

We see neither reason nor authority for distinguishing between unconstitutional composition of a grand jury, as in Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), and unconstitutional proceedings of a grand jury, as here, although the Supreme Court has used broad language to the effect that "An indictment returned by a legally constituted unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits." Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956); repeated in Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). The context in each of these two cases shows that this broad language applies only when grand jury proceedings have not violated constitutional rights.

The petitioner Costello had urged that an indictment based solely on hearsay evidence violated the Fifth Amendment requirement that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * *." 350 U.S. at 361, 76 S.Ct. 406. In rejecting this contention the Supreme Court used the broad language quoted above and immediately added "The Fifth Amendment requires nothing more", *i.e.*, nothing more than an "indictment returned by a legally constituted and unbiased grand jury, * * * if valid on its face". 350 U.S. at 363, 76 S.Ct.

4060. This means that the grand jury clause of the Fifth Amendment "requires nothing more". No other constitutional question was before the Court. We do not understand the Court's opinion to say anything about any other constitutional question. Due deference forbids us to interpret the opinion as containing a vast dictum to the effect that the entire Constitution, including all its Amendments, "requires nothing more"; in other words, that the proceedings of a legally constituted and unbiased grand jury may violate any number of the defendant's constitutional rights, including his right to the assistance of counsel and his privilege against self-incrimination, without affecting the validity of the indictment. *Costello*, therefore, is no bar to our view that an indictment obtained in violation of constitutional rights must be dismissed. On the contrary, *Costello* substantially supports this view. For the Supreme Court affirmed the conviction of Costello on the ground that the grand jury's action in indicting him had not violated his constitutional rights. The Court thereby implied that if the grand jury's action had violated his constitutional rights, the indictment would have been invalid and the conviction would have been reversed.

At a former trial in *Lawn* the District judge had dismissed indictments, largely on the ground that compelling prospective defendants to appear for questioning before a grand jury was analogous to compelling them to appear in a criminal trial, though the judge also noted, as we do in this case, that there had been no adequate warning. 115 F.Supp. 674 (1953). Lawn and his co-defendants were afterwards re-indicted for similar crimes and convicted. In the Supreme Court they claimed that the evidence obtained from them in the first grand jury proceeding was used against them in the second grand jury

16. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950). That an indictment cannot be challenged on the ground that inadequate or incompetent evidence was presented to the grand jury, Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956), is irrelevant here, since admission of such evidence violates no constitutional right.

proceeding. The Supreme Court said: "We deal here only with the question whether petitioners, in the circumstances of this case, were entitled to a preliminary hearing to enable them to satisfy their unsupported suspicions that the 1953 grand jury that returned this indictment made direct or derivative use of the materials which they produced before the 1952 grand jury. We hold that they were not." 355 U.S. at 350, 78 S.Ct. 311.[17] This seems to indicate that if the "unsupported suspicions" had been facts, the second indictment would have been invalid and the resulting convictions would have been reversed.

## VI

■ In United States v. Tane, 329 F. 2d 848, decided by the Court of Appeals for the Second Circuit on March 24, 1964, a District Court had dismissed an indictment on the ground that it resulted from illegal wire tapping. The government's brief on appeal in that case conceded that "where, as here, the indictment rests *almost exclusively* on challenged testimony, if the challenge is sustained, the indictment may be dismissed." (p. 2). The Court of Appeals held that dismissal of the indictment was within the District Court's discretion and that, in the light of the government's concession, discretion had not been abused.

The record before us in the present case does not show, and the District Court did not determine, what testimony tending to support the indictments, other than Short's confessions, was before the grand jury. Judges Washington and McGowan think the District Court should determine that question and should then decide whether the indictments of Short should be dismissed. Irrespective of any constitutional question, they think that on this record the taking of the uncounseled defendant before the grand jury should not be countenanced by us in the exercise of our supervisory power over the administration of criminal justice in the District of Columbia.[18] So that there may be a majority, Judges Bazelon, Fahy and Wright and I join Judges Washington and McGowan in thus disposing of the dismissal matter for the present, although we think, as we have shown in parts III, IV and V of this opinion, the indictments should now be dismissed, not merely because of our supervisory power but because Short's compelled appearance before the grand jury violated his right against self-

---

17. *Lawn* and *Costello* are discussed in a Note, 111 U. of PA.L.REV. 1154, 1159–1163 (1963).

18. Judges Washington and McGowan add the following: We believe that the taking of this particular defendant before the grand jury, *without his first having had the benefit of consultation with counsel*, was extraordinary in its disregard of the realities of his situation, as well as of the customary practice. By the same token, it is hardly extraordinary for this court, vested as it is with responsibility for the supervision of criminal justice in this circuit, to hold that there was a defect in the administration of justice in this instance which warrants our intervention. The question then becomes the familiar, and perennially difficult, one of the sanction to be imposed if our supervisory power is to be at all meaningful. We have fixed upon a sanction more limited than automatic dismissal of the indictment without reference to the precise state of the evidence before the grand

jury. We have thought it sensible to have the District Court in this situation inform itself fully and accurately as to what the evidence was upon which the indictment can be said to have rested, and then to decide whether there was a foundation for it apart from that supplied *solely by means of the defendant's personal appearance before the grand jury.*

We are not unimpressed by the contention that, in light of the handling by defense counsel of the motion to dismiss the indictment, the District Court acted reasonably, considering that the position we now take has not heretofore been clearly articulated in this jurisdiction. However, we believe that, on the facts of this case, the interests of justice would have been better served if the trial judge had, irrespective of the positions taken by counsel, informed himself exactly of what happened before the grand jury and then disposed of the motion in the light of that knowledge. In cases arising from such indictments in the future, this procedure should be followed.

incrimination and because his right to counsel was violated by failure to notify his lawyer that he was to appear.

All the appealed convictions are reversed and the cases are remanded to the District Court for further proceedings consistent with parts I, II, and VI of this opinion. Less than a majority of the court think our ruling in part VI should have retroactive as well as prospective application. That ruling is therefore limited to the present case and cases in which indictments are hereafter found or sought. Compare Durham v. United States, 94 U.S.App.D.C. 228, 240, 214 F.2d 862, 874, 45 A.L.R.2d 1430 (1954).

Reversed and remanded.

PRETTYMAN, Senior Circuit Judge (dissenting):

Judge Edgerton's opinion is divided into parts (I to VI), and this dissent will follow that same format.

However, before discussing Point I, I advert to the facts. I am deeply disturbed because it seems to me that the brief résumé contained in the majority opinion does not describe the case shown by the record.

*Facts*

About a year and a half before the events in the District of Columbia with which we are concerned, a North Carolina warrant issued (on March 6, 1961) in the Recorder's Court of Zebulon, Wake County, North Carolina, for the arrest of one Willie Lee Short upon a charge of assault with a deadly weapon, alleged to have occurred in that County. Deputy Sheriff Blakeley knew the Short family and attempted to execute the warrant but failed to find the accused except upon one occasion when Short fled in a car.

On August 10, 1962, almost a year and a half after the foregoing, a warrant was issued by the Municipal Court for the District of Columbia [1] for the arrest of Willie Lee Short upon a charge of attempted robbery allegedly committed in

Washington on August 3, 1962. Detective Sergeant O'Bryant, of the Metropolitan Police, who obtained the warrant, teletyped police in North Carolina and Virginia giving the names and addresses of Short's relatives in North Carolina.

On August 13, 1962 (the same month) another warrant, alleging the robbery on July 28th of a liquor store in the District of Columbia, was issued by the Municipal Court here. It called for the arrest of one David Jones, said to be from Zebulon, North Carolina. Two days later Jones gave himself up and was subsequently bound over to the grand jury.

Sometime early the next month, i. e., in September, Deputy Sheriff Blakeley, in Zebulon, North Carolina, received information that Short was at a given address in Raleigh. A couple of days later (Thursday, September 13, 1962) Raleigh police officers went to the given address with a copy of the Wake County warrant; Short went out the rear door but was apprehended, and the officers radioed Sheriff Blakeley in Zebulon. Blakeley told them that Short was also wanted in Washington, D. C. Some difficulty in locating the teletype ensued, but the following morning O'Bryant confirmed to a Deputy Sheriff Kelly that Short was wanted here and inquired whether he would "waive extradition". Kelly talked to Short, read the extradition document twice to him, told him he did not have to sign if he did not want to, and explained the procedure. Short said he would "come back here" and signed the waiver of extradition.

O'Bryant flew to Raleigh the next morning, Saturday, September 15th, arriving at about ten o'clock. It took a short while for him to get to the sheriff's office and for Short to be brought from his cell. O'Bryant noted on the warrant: "Arrested 9–15–62 10:30 AM Sheriff's Office, Raleigh, N. C."

O'Bryant told Short he need not give a statement and that if he gave one it could be used against him. Sheriff Scarborough was present and heard O'Bryant

---

1. Now the District of Columbia Court of General Sessions.

so advise Short. O'Bryant then inquired about several robberies, four in all, and Short denied knowledge of any of them. The officer then described to Short the evidence the police had against him. They had Short's fingerprints in the grocery store. David Jones had turned himself in. The police had Jones's shoes, later identified by a witness as the shoes worn by a participant in the robbery. They had the shotgun obtained from an alleged accomplice's apartment on a search warrant. O'Bryant testified, "I informed him of * * * some of the evidence that we had and at that time he said, 'Well, I may as well tell you the truth about it,' and he told me." O'Bryant further said, "Yes, I would say within an interval of two minutes or three minutes." The trial court found: "Officer O'Bryant testified, and I believe him, that this man confessed to him in Raleigh because he said he wanted to give him the whole story. When he found out that there was other evidence, he gave the whole story because he wanted to get it off his chest * · * *."

O'Bryant obtained a typewriter and typed Short's answers into statements. The first statement concerned the attempted robbery of the grocery store. It was begun at 12:30 p. m. and concluded at 1:03. Short implicated David Jones and one Johnson in whose apartment the gun had been found. The second statement was begun at 1:10 and concluded at 1:40. It concerned the liquor store robbery, and Short implicated David Jones, Arthur Jones (David's brother), and a man named Johnson. Two more statements concerning robberies not in the cases at bar followed. The last one was finished sometime during the afternoon.

O'Bryant did not ask Short to sign the statements upon their completion, because he had discovered that Short did not read well and, O'Bryant testified, he knew police had been accused of forcing defendants to sign statements and he and Short were alone at the time. He therefore asked to have Short's family come in. About eight o'clock that evening Short's wife, his sister, and the latter's fiance came to the Sheriff's office. O'Bryant explained that he was going to read some statements and, if anything he read was not true, they were to interrupt and say so. O'Bryant read the statements; nobody interrupted; and O'Bryant asked Short if the contents of the statements were true. He answered they were. Then Short, his sister, and the latter's fiance all signed the statements.

On Sunday morning, September 16th, O'Bryant and Short boarded a plane for Washington. En route O'Bryant talked to Short about whether he wanted to testify before the grand jury; Short said he wanted to tell the truth about the whole thing; and he (O'Bryant) said that provision could be made. They arrived in Washington about noon. The record does not indicate that Short was questioned or otherwise subjected to any procedure, except routine booking, etc., that afternoon or evening. On Monday morning, September 17th, at ten o'clock, Short was presented to a judge sitting in the Municipal Court. A lawyer was appointed, and Short talked briefly to him, telling him he (Short) had signed statements in North Carolina "to come back to Washington, D. C." Hearing was waived, and Short was bound over to the grand jury.

On October 2nd Short was taken before the grand jury. The transcript of that hearing showed that the prosecutor said to Short, and Short answered:

"Question: Mr. Short, I want you to know that you are before the Grand Jury and that we are going to ask you some questions. I want you to know you don't have to say anything here if you don't want to. You don't have to tell us anything. If you do tell us anything your statement is being taken down and can be used against you at any future trial arising out of any other matters that we talk about here, or any other matters. Do you understand that?

"Answer: Yes.

"Question: Knowing that you still want to come in here and testify?

"Answer: Yes."

The statements made by Short in North Carolina, witnessed by his sister and her fiance, were read to Short before the grand jury, and he was asked if they were true. The transcript shows he answered, "Yes." On the stand upon the hearing Short said he answered, "No."

On October 8th Short, Johnson, and David Jones were indicted for attempted robbery of the grocery store and, together with Arthur Jones, for robbery of the liquor store. On arraignment Short pleaded not guilty.

On November 21st Johnson turned himself in and became a witness for the Government in both cases. He pleaded guilty in one case, and the other indictment was dismissed as to him. Motions to suppress the confessions and to dismiss the indictments were made, heard and denied. Trial on the robbery of the liquor store was had on December 12th to 19th, and trial on the attempted robbery of the grocery store began January 15, 1963. Besides other evidence, such as fingerprints, the shotgun, and, in one case, identification by the victims, the Government presented Johnson as a witness in both cases, and it presented the written statements made by Short in North Carolina. The defense put Short's sister and her fiance on the stand. The juries returned verdicts of guilty in both cases. The appeals now before us are the consolidated appeals from those convictions.

I.

*Admissibility of Statements*

A.

The court holds Short's statements to O'Bryant to have been inadmissible under the *McNabb-Mallory* rule, citing also *Upshaw.* Upon the facts in the record now before us, no point is presented within the doctrine of *McNabb-Mallory-Upshaw.* That doctrine is that "a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate." [2] The heart of the doctrine is a delay under federal detention,—not merely delay but delay during detention. The purpose of the doctrine is to require federal officers, over whom the Court has supervisory power (the doctrine is not a constitutional principle), to obey a Rule. The remedy provided by the *McNabb* line of cases is applicable to confessions made while a federal officer is illegally withholding a prisoner from presentment.

In the cases at bar there was no detention, no holding in custody, by any federal or District of Columbia officer at the time these confessions were made. Short was in the custody of a North Carolina sheriff, being held under a serious charge of violation of a North Carolina law. My brethren spell a custody on O'Bryant's part from his notation at the time on the warrant, a matter I shall discuss in detail in a moment. There is no shred of evidence that the North Carolina sheriff turned Short over to O'Bryant with permission to take him to a federal magistrate with authority to set him free. And it is fantastic to assume that the sheriff had any such idea. O'Bryant could not have terminated Short's detention, no matter what he (O'Bryant) did. There simply was no detention by federal authority at that point.

The Supreme Court has met this point squarely, succinctly and clearly. The Second Circuit had the question in United States v. Coppola.[3] Buffalo city police had Coppola under arrest for a series of state offenses. FBI agents interrogated him about a bank robbery. He confessed to them. After noon the next day the Buffalo police turned him over to the federal officers, and he was duly presented. The Second Circuit, sitting *en banc,* held the confessions admissible—"uncoerced confessions made during a detention by state officers which the Federal officials did not induce and were powerless to pre-

---

2. Upshaw v. United States, 335 U.S. 410, 413, 69 S.Ct. 170, 93 L.Ed. 100 (1948).

3. 281 F.2d 340 (1960).

vent." The Supreme Court granted certiorari, heard argument, and then in a one-paragraph Per Curiam opinion affirmed the Circuit.[4] The question now before us is precisely the question in *Coppola*.

It may be that a rule ought to be announced that a confession to a federal officer, made while a person is in the lawful custody of state officers under a state charge, is inadmissible in a federal court. But that would be a new rule. It would not be under the *McNabb-Mallory* doctrine; no court has ever as yet announced such a rule; and it would be in exact contradiction to the Supreme Court decision on the subject.[5]

### B.

Regardless of the foregoing, Short's statements were admissible. Short confessed orally to O'Bryant within two or three minutes after O'Bryant, who had just arrived in Raleigh by plane from Washington, began to talk to him. Some conversation ensued. O'Bryant was interested in a series of robberies—four at the moment. Then, on borrowed equipment, O'Bryant typed out the statements. As heretofore stated, the first typing was begun at about 12:30 and was completed at 1:03 o'clock. The court says that the time of the confession, for the purposes of the Rule, was 12:30 and that the time from 10:30 to 12:30 was unnecessary delay.

We have had this problem a number of times. We had it in *Metoyer*,[6] in *Heideman*,[7] in *Porter*,[8] in *Jackson*,[9] and in *Muschette*.[10] We have never, until now, so far as I can ascertain, held that a "threshold" confession is inadmissible because of some later minor delay in understanding the details and reducing them to writing.[11] The court is now writing new law on this point.

4. Coppola v. United States, 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (1961).

5. For similar cases holding confessions given during a period of state detention admissible, see Hollingsworth v. United States, 321 F.2d 342 (10th Cir. 1963); United States v. Sailer, 309 F.2d 541 (6th Cir. 1962), cert. denied, 374 U.S. 835, 83 S.Ct. 1884, 10 L.Ed.2d 1057 (1963); Morgan v. United States, 111 U.S.App.D.C. 127, 294 F.2d 911 (D.C.Cir. 1961), cert. denied, 368 U.S. 978, 82 S.Ct. 482, 7 L. Ed.2d 439 (1962); Tillman v. United States, 268 F.2d 422 (5th Cir. 1959); Carpenter v. United States, 264 F.2d 565 (4th Cir.), cert. denied, 360 U.S. 936, 79 S.Ct. 1459, 3 L.Ed.2d 1548 (1959); Stephenson v. United States, 257 F.2d 175 (6th Cir. 1958); Papworth v. United States, 256 F.2d 125 (5th Cir.), cert. denied, 358 U.S. 854, 79 S.Ct. 85, 3 L.Ed.2d 88 (1958); Horne v. United States, 246 F.2d 83 (5th Cir.), cert. denied, 355 U.S. 878, 78 S.Ct. 143, 2 L.Ed.2d 109 (1957); Brown v. United States, 228 F.2d 286 (5th Cir. 1955), cert. denied, 351 U.S. 986, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956).

6. Metoyer v. United States, 102 U.S.App. D.C. 62, 250 F.2d 30 (1957).

7. Heideman v. United States, 104 U.S.App. D.C. 128, 259 F.2d 943 (1958), cert. denied, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed. 2d 767 (1959).

8. Porter v. United States, 103 U.S.App.D. C. 385, 258 F.2d 685 (1958), cert. denied,

360 U.S. 906, 79 S.Ct. 1289, 3 L.Ed.2d 1257 (1959).

9. Jackson v. United States, 114 U.S.App. D.C. 181, 313 F.2d 572 (1962).

10. Muschette v. United States, 116 U.S. App.D.C. 239, 322 F.2d 989 (1963), vacated and remanded on other grounds, 378 U.S. 569, 84 S.Ct. 1927 (1964).

11. In addition to the cases cited above, see Bailey v. United States, 117 U.S.App.D. C. 241, 328 F.2d 542 (1964); Hughes v. United States, 113 U.S.App.D.C. 127, 306 F.2d 287 (1962); Turberville v. United States, 112 U.S.App.D.C. 400, 405-406, 303 F.2d 411, 416-417 (1962); Sawyer v. United States, 112 U.S.App.D.C. 381, 303 F.2d 392, cert. denied, 371 U.S. 879, 83 S.Ct. 150, 9 L.Ed.2d 116 (1962); Lockley v. United States, 106 U.S.App.D.C. 163, 270 F.2d 915 (1959). Cf. Goldsmith v. United States, 107 U.S.App.D.C. 305, 313-315, 277 F.2d 335, 343-345, cert. denied sub nom. Carter v. United States, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed.2d 86 (1960). For cases from other circuits see Evans v. United States, 325 F.2d 596 (8th Cir. 1963); United States v. Long, 323 F.2d 468 (6th Cir. 1963); United States v. Ladson, 294 F.2d 535 (2d Cir. 1961), cert. denied, 369 U.S. 824, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962); Muldrow v. United States, 281 F.2d 903 (9th Cir. 1960); Holt v. United States, 280 F.2d 273 (8th Cir. 1960), cert. denied, 365 U.S. 838, 81 S.Ct. 750, 5 L.Ed.2d 747 (1961).

The court says it does not now over-rule the cited cases. Such being the situation, I submit that the court ought to follow the cases, whether some members disagree with them or not. The case at bar is an even more vivid illustration of the principle involved than are the cases cited. Here the oral confession was made "within * * * two minutes or three minutes"; several offenses and a complicated set of facts were involved; four participants were involved, not all of them in all of the crimes. The inquiring officer was alone, was in strange territory, and had to use borrowed equipment.

## C.

The court rests its ruling on this point upon a failure by O'Bryant to take Short before a United States Commissioner or a judge in compliance with Rule 40(b). To make this ruling the court was required to find an unnecessary delay after Short was arrested and before he confessed. In other words, the confession must be due to an illegal detention during an unnecessary delay.

The court says Short was "arrested" at 10:30 Saturday morning. It bases this finding solely upon the fact that O'Bryant wrote "Arrested 9–15–62 10:30 AM" on the warrant he had with him. Of course what O'Bryant meant was that he read the warrant to Short or served a copy upon him. That is "arrest" in normal parlance. The notation had nothing whatsoever to do with a transfer of custody. But in the circumstances of this case delay on O'Bryant's part must be measured by a period of actual custody. O'Bryant's delay could not begin until he had control over the prisoner. He had no inherent control over Short; he needed the permission of state officials who were holding Short on a state charge. My brethren say there is no evidence that Short became O'Bryant's prisoner later than the 10:30 mentioned. That is a pure speculation, if "prisoner" means one in custody. And the speculation is unrealistic. The hour of 10:30

was a very few minutes after O'Bryant's arrival at the sheriff's office, he having touched down at the airport at about ten o'clock. The sheriff was not holding Short for O'Bryant. He was holding him on his own account for a serious offense in North Carolina.

The object of Rule 40(b) is to obtain a warrant for removal to another jurisdiction. In this respect it differs from Rule 5(b), which results merely in a holding of the accused in the same jurisdiction. The North Carolina sheriff, in yielding custody of Short, would have been yielding him for removal out of North Carolina. Furthermore Rule 40(b) requires that when a warrant of removal is issued "the defendant shall be admitted to bail". So the sheriff would have been yielding Short for admission to bail. In addition to these considerations there is the delicate relationship between state and federal[12] authority in criminal cases. That this relationship is not one of unalloyed mutual love and affection is one of the better known facts of judicial administration in our day.

There is no evidence that the sheriff would have released custody at any time prior to the time he did actually make the release, i. e., when O'Bryant was en route to the plane. My brethren say there is no evidence to the contrary; therefore they assume the sheriff would have—indeed that he did—turn Short over to O'Bryant about noon on Saturday, with permission to get a warrant of removal and bail. I think we cannot reverse convictions by speculating facts not in the record before us. And I think the speculation in this case is totally unrealistic. Every consideration obvious on the record indicates that the sheriff would—as he actually did—move with some degree of deliberation. An instantaneous transfer of uninhibited custody to a strange out-of-state officer under the facts of this case seems to me to be beyond the realm of permissible unsupported inference.

12. In the eyes of North Carolina, the District of Columbia is federal.

The sheriff actually released Short to O'Bryant on Sunday morning. The confessions had been given, typed, read to the family, and reaffirmed in their presence. There was no delay on O'Bryant's part prior to those events. Delay thereafter, if any, was immaterial.[13]

### D.

Other considerations are pertinent:

(a) I emphasize as vehemently as I can that there is a duty—a positive, affirmative duty—to ask a suspected person, before he is presented to a magistrate under a solemn formal charge, whether he knows anything about the alleged offense. To my mind the contrary is the essence of the so-called police state. That would really be police tyranny.

(b) The typing of a purported confession is a protection to the accused as much as it is a weapon for the police. Understanding of oral expressions is often uncertain, recollections are frequently inexact, and memory is characteristically faulty. But with a writing an accused can be charged with no more than, and nothing else but, what he said. Exemplary police procedure requires the reduction of confessions to writing. This requires the facts to be sorted and the statement of them to be accurate. And that takes a bit of time.

(c) The warrant O'Bryant had with him was not a federal warrant. It was issued by our Municipal Court and had the status of a state warrant, good only in the jurisdiction of issue.[14] Moreover O'Bryant was not a federal officer but a Metropolitan policeman, having the status of a sheriff or other state officer.[15]

He had no authority to make an arrest in North Carolina.

(d) There is no evidence or semblance of evidence—and indeed no claim—that Short was subjected to any form of coercion or to extended questioning for the purpose of obtaining a confession. Lieutenant O'Bryant's conduct was characterized by all concerned on the scene at the time, including members of Short's family, as exemplary; he, a Negro officer, was "rather nice to Willie." My view is that his conduct throughout deserves hearty commendation.

(e) Short was repeatedly told before he spoke that he need not make a statement and that if he made one it could be used against him. He was warned. Nevertheless he talked; he had a right to, as I understand the law.

### II

This question is whether the admission of Short's confession, with all other names deleted, was reversible error in respect to all other defendants. Short's confessions were introduced in each trial in which he was a defendant, with the names of his co-defendants deleted. In the robbery trial the jury was cautioned by the trial judge, immediately before the confession was read to them, that the confession represented evidence against Short only and was not to be considered against David and Arthur Jones. Further admonitions to this effect were included in the court's charge to the jury at the close of the case. Similarly, in the attempted robbery trial, the jury was cautioned by the trial judge, immediately after the confession was read to them, that the confession was evidence against Short only; the instruction was also re-

13. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944); Jackson v. United States, 114 U.S.App.D.C. 181, 313 F.2d 572 (D.C.Cir. 1962).

14. Judge Rice, in Kirkes v. Askew, 32 F. Supp. 802 (E.D.Okl.1940), collects a number of cases on the point. Even assuming that the warrant, like one issued under Fed.R.Crim.P. 4, was valid outside the District of Columbia, O'Bryant had no au-

thority to execute it. See D.C.Code § 4–138 (1961 ed.).

15. See D.C.Code § 4–136 (1961 ed.), which bestows upon members of the police force "all the common-law powers of constables," with certain enumerated exceptions. At common law the acts of an officer beyond his jurisdiction were void. See 47 Am.Jur. Sheriffs, Police, and Constables § 29 (1943), and cases cited therein.

peated at the end of the case. In each instance counsel for the defense expressed satisfaction with the instructions as given.

The course followed by the trial judge, deleting the names of the co-defendants and twice in each case admonishing the jury on the point, was in accordance with established practice in federal courts. Sitting *en banc* we specifically referred to the rule with approval as recently as January, 1963, in Dykes v. United States.[16] Implicitly we approved it in Kramer v. United States.[17]

The Supreme Court has had this problem in several contexts in recent years. In the *Anderson* case the Court found that, although the trial judge admitted the disputed confessions under a restriction, "his charge bound the jury to no such restricted use of the confessions", and that from what he told them the jury had every right to believe it could consider against every defendant the whole proof made at the trial.[18] The Court reversed. In *Malinski*,[19] a state case, the trial judge substituted letters for the names of the other defendants and gave clear instructions as to the limitation. The Court affirmed. In *Delli Paoli*[20] the Court found the instructions as to limited use of the confession to be clear, and assumed the jury followed the instructions. The Court affirmed. We think it clear that under the law as it is firmly established, the trial court in the case at bar was correct in its treatment of the matter.

This court now relies upon a frank dictum by Judge Learned Hand.

The rule now announced, that statements by one defendant cannot be admitted in a joint trial even with repeated cautions by the trial judge that the evidence is admitted against the one defendant alone, will of course largely eliminate joint trials of joint offenders. My dissenting brethren and I think the resulting confusion, multiplied delays, and frequent raw injustice are not in the best interest of the administration of justice.

### III

This part of Judge Edgerton's opinion concerns Short's appearance before the grand jury. It does not have the concurrence of a majority of the court and so is a dissent.

Our brethren say that Short's constitutional right against self-incrimination was violated when he was presented to the grand jury, and that therefore the indictment should be dismissed. Distilled, the point is that inadmissible testimony was received by the grand jury. But the cases are clear that the reception of inadmissible evidence does not invalidate a resultant indictment. Lawn v. United States[21] is specific on the point.[22] The claim by petitioners in that case was that evidence obtained from them in violation of the Fifth Amendment was received by the grand jury. The Court, citing *Holt*[23] and *Costello*,[24] said that the admission of such evidence would not invalidate the indictment.

The late Chief Judge Charles E. Clark, writing for the Second Circuit in United

16. 114 U.S.App.D.C. 189, 190, 313 F.2d 580, 581, cert. denied, 374 U.S. 837, 83 S.Ct. 1889, 10 L.Ed.2d 1059 (1963).

17. 115 U.S.App.D.C. 50, 317 F.2d 114 (1963).

18. Anderson v. United States, 318 U.S. 350, 356–357, 63 S.Ct. 599, 87 L.Ed. 829 (1943).

19. Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945).

20. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957).

21. 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1956).

22. And see Coppedge v. United States, 114 U.S.App.D.C. 79, 311 F.2d 128 (D.C.Cir. 1962), cert. denied, 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963).

23. Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).

24. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

States v. Cleary,[25] examined this subject exhaustively. Cleary, having been arrested, was subpoenaed to appear before the grand jury and, after warning, testified at length, deeply incriminating himself. Largely upon this testimony the grand jury indicted him. The District Court dismissed the indictment. The Circuit Court reversed and reinstated the indictment. Judge Clark pointed out that the District Court's reasoning in the case might well apply where an accused is called upon to testify at his own trial; but, he said, "it must be noted that a grand jury investigation, though in a sense a criminal proceeding, [citation omitted] is not closely analogous to a criminal trial." "Basically," he said, citing a long list of cases and many scholarly authorities, both American and English, "the grand jury is a law enforcement agency." And further, he pointed out, "Appearing before a grand jury is not in itself an unduly coercive situation. * * * That he [the witness] was nervous and confused during his testimony—a not unusual reaction of a witness—is not sufficient to render the testimony involuntary. The important factor is the lack of even the slightest suggestion that government officials applied any pressure or engaged in any form of misconduct which contributed to his testifying." The entire discussion of Judge Clark is pertinent to the problem in the case at bar and should be read in this connection. The view of our dissenters is directly contrary to *Lawn* and *Cleary*.

Three facts in the case at bar put the matter beyond the realm of dispute. First, before he spoke to the grand jury, Short was advised four times that he need not speak: once orally by O'Bryant in Raleigh; once in the opening of his written statement, read in the presence of his family; once by a judge in open court; and once by the prosecutor before the grand jury. Our dissenters say nobody told Short specifically he need not speak to the grand jury if taken there. The transcript of the grand jury proceedings, quoted above, shows that the prosecutor was crystal clear—"You don't have to tell us anything." Second, the evidence shows Short wanted to talk to the grand jury. While on the witness stand in court upon the motions to dismiss and suppress, he was asked why he wanted to go before the grand jury, and he answered, "Because I know that I hadn't did anything." Surely a statement of the reason why he wanted to go is a respectable implication that he wanted to go. And surely when that question was asked he would have answered, "I didn't want to go," if indeed that had been in his mind. Moreover O'Bryant testified specifically on the point, and the transcript of the grand jury proceedings is indisputable. Third, the trial jury was not told what Short said or did before the grand jury. Thus whatever he said or did there was no prejudice upon his trial.

We cannot agree with the reasoning of our brethren. They say that mere interrogation before a grand jury, merely being brought there, may arouse suspicion and therefore is prohibited. But the grand jury is an investigating body. If it is to function at all, it must ask questions. Our brethren say testimony before a grand jury might be used at trial, even though it was not so used in this case. It seems to us we should at least await a proper case. Our brethren say Short was young, indigent and unschooled. He was 22 years old, married, and had two children. He had a job at a warehouse in his home town of Zebulon and had had it for a month before he was arrested. There is no evidence that he could not have had that job any time he went home. His sister testified he went to the third or fourth grade at a public high school. There is no evidence that he could not have continued there; a school drop-out is not *ipso facto* immune from liability for crime.

Our dissenters would have us adopt a new rule of law, a rule which ignores the fundamental differences between the

---

25. 265 F.2d 459, cert. denied, 360 U.S. 936, 79 S.Ct. 1458, 3 L.Ed.2d 1548 (1959).

grand jury and a trial, a rule not accepted in any federal jurisdiction and used by only a few states.[26]

## IV

Judge Edgerton does not have the concurrence of a majority of the court on this point, and so his opinion on it is a dissent.

The question is whether the indictment must be dismissed because of the situation in respect to counsel. The Supreme Court has twice stated the rule respecting the validity of indictments in a similar context. In Costello v. United States [27] the Court, in an opinion by Mr. Justice Black, said:

> "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."

And in Lawn v. United States [28] the Court, in an opinion by Mr. Justice Whittaker, without dissent on the point, used exactly the same language.

In the case at bar the grand jury which returned this indictment was legally constituted. It had jurisdiction. No allegation is made that it was biased.

Moreover Short had a lawyer. One was appointed for him at the preliminary hearing where he was bound over to the grand jury. No rule, so far as I know, says that a person who has had a lawyer and has been fully advised of his rights by a judicial officer must again consult a lawyer before he can be taken before a grand jury.[29] My brethren agree that Short could not have had a lawyer with him in the grand jury room.[30] That being so, the most a lawyer could have done would have been to advise him that he need not speak. But he had already been given that advice by a judicial officer in open court in the presence of the lawyer, and he was formally given a full warning to the same effect by the prosecuting attorney before he spoke to the grand jury. To say that a person has a right to a lawyer under such circumstances for such purely theoretical purposes is to assert the necessity of a ritual without substance. The constitutional guarantee is not of empty gestures. Our dissenting brethren refer to Short as "uncounseled". That, of course, is inaccurate.

Our dissenting brethren (in Part V of the opinion) characterize the statement twice made by the Supreme Court, in Costello and in Lawn, as "broad language to the effect that '[quoting the words we have above quoted].' " They say the context shows a drastically limited meaning to the plain words. They say "Due deference forbids us to interpret the opinion [in Costello] as containing a vast dictum * * *." We view the quoted statement by the Court as clear and complete. It phrases a well-established rule. It is consistent with a plentitude of past authority, some of which is cited in the opinion. We apply this ruling of the Supreme Court as we find it.

---

26. See generally Orfield, *The Federal Grand Jury*, 22 F.R.D. 343, 431–432 (1959); 45 IOWA L.REV. 564 (1960); 67 Yale L.J. 1271 (1958); 38 A.L.R.2d 237, 238 (1954).

27. *Supra* note 24, 350 U.S. at 363, 76 S.Ct. 406.

28. *Supra* note 21, 355 U.S. at 349, 78 S.Ct. 311.

29. Arguments that such a rule exists were rejected in Gilmore v. United States, 129 F.2d 199, 203 (10th Cir.), cert. denied, 317 U.S. 631, 63 S.Ct. 55, 87 L.Ed. 509 (1942). See also United States v. Scully, 2 Cir., 225 F.2d 113, cert. denied, 350

U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955); Orfield, *The Federal Grand Jury*, 22 F.R.D. 343, 425 (1959); cf. Escute v. Delgado, 282 F.2d 335 (1st Cir. 1960), cert. denied, 365 U.S. 883, 81 S.Ct. 1033, 6 L.Ed.2d 193 (1961); FED.R.CRIM.P. 44, and Advisory Committee's Notes thereto.

30. *In re* Groban, 352 U.S. 330, 333, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957). Fed.R.Crim.P. 6(d) clearly forbids the presence of counsel by limiting those present while the grand jury is in session to "[a]ttorneys for the government, the witness under examination, interpreters when needed, and * * * a stenographer".

## V

In this part of his opinion Judge Edgerton is in dissent. He maintains that the indictment against Short should be dismissed for the reasons advanced in Parts III and IV of the opinion.

In this Part V Cassell v. Texas [31] is relied upon. Our brethren say they see neither reason nor authority for distinguishing that case. There the Supreme Court held that the grand jury was illegally constituted; therefore the case fell within the familiar and well-established rule that an illegal grand jury cannot return a legal indictment. Our brethren say, in effect, that a constitutional question is a constitutional question; there was such a question in *Cassell,* and there is one here; the indictment was invalid in *Cassell;* therefore the indictment is invalid here. We think *Cassell* does not remotely approach the question in the case now at bar.

## VI

On this point Judge Edgerton speaks for the court. The present opinion is in dissent.

The court directs the District Court to examine the evidence taken by the grand jury and to determine "what testimony tending to support the indictments, other than Short's confessions, was before the grand jury." The District Court is then to determine whether the indictments should be dismissed.

Prior to trial counsel for Short made a motion to dismiss the indictments on the ground that Short was brought before the grand jury, in police custody and without counsel, to testify against himself. The motion was argued to the court. The judge quickly raised a question as to other evidence.[32] He suggested that he inspect the grand jury minutes He said, "I'm not going to assume that

his own testimony was all there was." Counsel replied that "Regardless, Your Honor, of what other testimony there was," Short's constitutional rights had been violated. The judge pressed for a clear statement of counsel's position. Counsel urged with considerable emphasis that being brought before the grand jury without counsel and without being advised of his rights violated the person's rights. The prosecutor interjected with a suggestion that counsel stipulate that there was other evidence before the grand jury, that the Government presented evidence as to a fingerprint of Short's in one of the cases. Defense counsel said that had nothing to do with the case. The court then said: "I am assuming, because I have no right not to assume,— I am assuming that there was other valid evidence before the grand jury to justify his indictment in this case. Now you are not arguing to me that there was no other evidence before the grand jury, are you?" The court then denied the motion to dismiss.

Thus it is perfectly clear on the record that motions to dismiss were made and argued; that Short's counsel did not allege there was no other evidence than Short's testimony; and that he offered no proof to that effect. He ignored the judge's offer to look at the grand jury's minutes, and he ignored his adversary's proffer to stipulate that there was other evidence. He went to the court on the proposition that Short's illegal presentment to the grand jury invalidated the indictment regardless of what evidence was before the grand jury.

So it is clear that the District Court itself before the trial raised the question of other evidence, and that counsel for the defense chose to assume there was such evidence and declined to probe or to join in a probe of the matter. Thus this court's present order directs a retread-

---

31.  339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950).

32.  When counsel for Short began his argument the following occurred:

"THE COURT: Now you are assuming —you must be assuming that there was

no other evidence before the grand jury of his guilt except his own testimony.

"MR. KRAMER [Defense Counsel]: I do not know what evidence was brought before the grand jury."

ing of ground already trod, and reverses the trial court on a point examined, considered and decided by it.

Several well-established propositions of law bear upon the problem. First, as we have stated it in *Carrado*,[33] "A motion to quash an indictment for the absence or incompetency of evidence before the grand jury is addressed to the discretion of the trial court and its action thereon will not be reversed except upon a showing of abuse of discretion." In United States v. Tane [34] the Second Circuit made precisely the same statement in almost the same words, and cited *Carrado*. There is ample other authority to the same effect.[35] Second, as we said in *Carrado*, "It is also true that an appellant who attacks an indictment returned in due form on the ground that it was returned without sufficient evidence, has the burden of clearly showing the absence of such evidence." [36] Third, there is a strong presumption of regularity accorded the findings of a grand jury. Multitudinous authorities support this proposition.[37] Four, even courts which held (as some federal courts did before Costello) that at least some competent evidence must be before the grand jury, held that courts will not inquire into the sufficiency of that evidence.[38]

The trial court acted in strict accord with the foregoing well-established principles. It made insistent inquiry into the subject. Its inquiry was met by a disclaimer of interest on the part of defense counsel and, on the other side, by a proffer of proof by the prosecutor. The judge emphasized the burden upon the movant of the motion and the presumption of regularity—*e.g.*, "I am assuming, because I have no right not to assume * * *." It ruled that, absent any claim or proof that no competent evidence was before the grand jury, the motion to dismiss must be denied. We say that the disposition of the matter by the trial court was eminently correct.

The present order of this court is counter to all the foregoing principles. The court accords no recognition to the discretion of the trial court in disposing of the motion to dismiss. It does not find an abuse of discretion; indeed no abuse could be found. This court accords no recognition to the presumption of regularity to grand jury proceedings. Instead of holding to the burden of proof upon the movant, this court holds that, even when counsel upon specific inquiry declines to seek proof, the trial judge commits reversible error unless he himself *sua sponte* determines what evidence, if any, there was. We think the proposed order of this court is clearly erroneous.

This court cites and relies upon United States v. Tane, supra. In that case the trial judge had granted a motion to dismiss. The Court of Appeals held this to be within his discretion and so affirmed.

33. Carrado v. United States, 93 U.S.App. D.C. 183, 188, 210 F.2d 712, cert. denied, 347 U.S. 1018, 74 S.Ct. 874, 98 L.Ed. 1140 (1954).

34. 329 F.2d 848, 853 (1964).

35. See, *e.g.*, United States v. Rosenburgh, 74 U.S. (7 Wall.) 580, 19 L.Ed. 263 (1868); Nanfito v. United States, 20 F. 2d 376 (8th Cir. 1927); Stewart v. United States, 300 F. 769 (8th Cir. 1924).

36. *Supra* note 33.

37. Carrado v. United States, *supra* note 33; United States v. Nunan, 236 F.2d 576, 594 (2d Cir. 1956), cert. denied, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957); Beatrice Foods Co. v. United States, 312 F.2d 29, 39 (8th Cir.), cert.

denied, 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199 (1963); 111 U.PA.L.REV. 1154, 1157 n. 20 (1963); 4 WHARTON, CRIMINAL PROCEDURE § 1852 n. 4 (1957).

38. 4 WHARTON, CRIMINAL PROCEDURE § 1852 n. 3, citing Anderson v. United States, 273 F. 20 (8th Cir.), cert. denied, 257 U.S. 647, 42 S.Ct. 56, 66 L.Ed. 415 (1921), and Olmstead v. United States, 19 F.2d 842, 53 A.L.R. 1472 (9th Cir. 1927), aff'd on other grounds, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). See also Murdick v. United States, 15 F. 2d 965, 968 (8th Cir. 1926), cert. denied sub nom. Clarey v. United States, 274 U.S. 752, 47 S.Ct. 765, 71 L.Ed. 1332 (1927).

How this ruling can be authority for reversing a trial judge who denied such a motion we do not see.

It is made quite clear in Judge Edgerton's opinion that four of our brethren would dismiss these indictments upon the ground that two of Short's constitutional rights were violated by his being taken before the grand jury, and that this fact vitiated the indictments. This position does not involve any question of evidence, as is made clear in the first paragraph of Point V and in Point VI. The opinion also states clearly that two others of our brethren would have the District Judge determine what testimony other than Short's confession was before the grand jury and "then decide whether the indictments of Short should be dismissed." But the ground upon which the District Court is to base its decision is by no means clear. Apparently testimony other than the confessions is to play a part. Apparently, if there be such other testimony, the court would deny the motion to dismiss; if there be none, it would grant the motion. Thus the ruling would depend upon the testimony. But the opinion further says that these two judges are of opinion that the taking of the uncounseled defendant before the grand jury should not be countenanced by us in the exercise of our supervisory power. From this latter statement it would appear that testimony has nothing to do with the decision the District Judge must make. Thus two quite different propositions are posed. One is that, if an accused is illegally taken before a grand jury, he cannot be made to answer for his crime; any indictment against him must be dismissed. The other proposition is that an indictment must be dismissed unless evidence other than confessions such as Short's was before the grand jury.

No claim is made that Short's confession was not made. No claim is made that it was not true. No claim is made that it was coerced in the sense that it was extracted by violence, or promises, or threats. Thus there is no claim that the confession was not competent evidence within the meaning of that term in the rules of evidence. The claim is that it was inadmissible in evidence under the *Mallory* rule [39] and that it was not "competent" evidence because it was inadmissible.

This is precisely the sort of thing the Supreme Court was dealing with in *Costello, supra.* Although the Government had presented 144 witnesses and 368 exhibits at that trial, only three witnesses, none of whom had first-hand knowledge, testified before the grand jury. Costello moved to dismiss the indictment because it was based on hearsay, *i. e.*, incompetent evidence. The Court noted that "Varying views have been expressed concerning whether indictments may be challenged because based in whole or in part on incompetent evidence", citing cases and texts.[40] The Court, speaking through Mr. Justice Black and without dissent, said:

" * * * But neither the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act. * * * There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. * * * And in this country as in England of old the grand jury has convened as a body of laymen, free from technical rules, acting in secret, pledged to indict no one because of prejudice and to free no one because of special favor. As late as 1927 an English historian could say that English grand juries were still free to act on their own knowledge if they pleased to do so. * * *.

"In Holt v. United States, [31 S.Ct. 2, 54 L.Ed. 1021], this Court

39. We hardly need pause to say that *Mallory* does not rest upon constitutional grounds but upon the supervisory power of the Supreme Court.

40. 350 U.S. at 361, 76 S.Ct. at 407, n. 4.

had to decide whether an indictment should be quashed because supported in part by incompetent evidence. Aside from the incompetent evidence 'there was very little evidence against the accused.' The Court refused to hold that such an indictment should be quashed, pointing out that 'The abuses of criminal practice would be enhanced if indictments could be upset on such a ground.' 218 U.S., at 248 [31 S.Ct. at 4]. The same thing is true where as here all the evidence before the grand jury was in the nature of 'hearsay.' If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury,[7] like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

"Petitioner urges that this Court should exercise its power to supervise the administration of justice in federal courts and establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. No persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial." [41]

In the *Costello* case the Court was dealing with a precise question upon which courts in this country and text authorities had theretofore differed. It recited the ancient English rule and unmistakably adopted it. It settled the problem in so far as we are concerned.

I am of opinion that the judgment of the District Court should be affirmed.

I am authorized to state that Circuit Judges WILBUR K. MILLER, DANAHER and BASTIAN agree with the foregoing opinion.

DANAHER, Circuit Judge (dissenting).

Judge Edgerton's opinion from which I dissent demonstrates how easily a simple matter can be made to seem complicated. As in some other cases of late, a synthetic situation is presented where a previously unnoticeable molehill is caused to resemble a constitutional Mt. Everest. Little more is required than the facts to cut it down to size. To that end we may turn appropriately to the transcript of the hearings on Short's pretrial motions.

Deputy Sheriff Kelly and another deputy in Wake County, North Carolina, had been looking for Short since the issuance of a North Carolina warrant on March 1, 1961. Wanted in Zebulon on a charge of assault with a dangerous weapon, Short had been "running"—a fugitive. The deputy sheriffs learned that by September in 1962, Short had been coming to his mother's house in Raleigh. Specifically, they received a "tip" on September 13, 1962 that he was there, and they went to the mother's house to arrest him.

Short's sister met the deputies near the front door. Asking them for a search

41. 350 U.S. at 362–364, 76 S.Ct. 406.

warrant and otherwise setting up a clamor concerning the presence of the officers, she managed to warn her brother who ran out the back door. Two local police remained outside. Short was climbing a fence in the rear of the house when the Raleigh police officers caught him. The deputies with Short in their cruiser by radio notified the Zebulon, North Carolina, authorities of the arrest. The latter then for the first time informed Kelly that Short was wanted in Washington. A check of teletype files in various headquarters finally revealed the name of Lieutenant O'Bryant of the Metropolitan Police as the author of an August 10, 1962 teletype request for assistance in locating Short. Meanwhile Short had been booked on the Zebulon charge and had been committed to jail in default of bail.

Deputy Kelly the next day telephoned to Lieutenant O'Bryant and learned that Short was still wanted here on a charge of armed robbery. O'Bryant asked the deputy to find out whether or not Short was willing to be returned to the District.

We may turn next to what had happened in Washington a month or so earlier. Short was then believed to be involved in at least two cases in the District of Columbia. On July 28, 1962, a man who turned out to be the appellant Short, armed with a sawed-off shotgun and accompanied by Johnson, David Jones and Arthur Jones had held up a liquor store. On August 3, 1962, Short, then armed with a revolver and accompanied by Johnson and David Jones, had attempted to hold up a grocery store. This time Short's fingerprints had been recovered from grocery cans which he had handled. Lieutenant O'Bryant thereafter, on August 10, 1962 to be exact, had obtained from the Municipal Court a warrant for the arrest of Short. Such a warrant "may be executed *in any part of the District* by any member of the police force * * *." (Emphasis added.) D.C.CODE § 4–138 (1961). That warrant, of course, possessed no force and effect in Raleigh, North Carolina. Still, if Short were willing to return here with O'Bryant, that Municipal Court document would offer at least some color of basis upon which the North Carolina state authorities might release their prisoner to the custody of O'Bryant.

So it was, with the more serious charges pending here, that O'Bryant asked the North Carolina officers to ascertain whether or not removal proceedings could be waived. Short was a North Carolina prisoner, so that consent of the state authorities was a prerequisite. If they were willing to yield the prisoner to the District of Columbia, the next step involved Short's consent. Unless he were to agree to removal, O'Bryant would have been required to swear out a complaint, Rule 3, and to serve a warrant for the arrest of Short, Rule 4, to be executed "by a marshal or by some other officer authorized by law," Rule 4(c). Then would follow the procedure prescribed in Rule 40(b).[1] Resort to such procedures became unnecessary, however, for Short on September 14, 1962, executed a waiver which read as follows:

"STATE OF NORTH CAROLINA
COUNTY OF WAKE

　　　14 day of September, 1962.
I, Willie Lee Short, Jr., hereby freely and voluntarily agree to accompany Det. O'Briant [*sic*] or other officer as a prisoner, from the County of Wake and State of North Carolina, to Washington, D. C. for the purpose of answering to the charge of Armed Robbery there pending against me.

Furthermore, I hereby waive all formality, and am willing to return to Washington, D. C. with the said Officer without the Governor's requisition, or the other papers legally necessary in such cases, and exonerate all concerned, including Robert J. Pleasants, Sheriff from any blame,

---

1. The foregoing references are to Federal Rules of Criminal Procedure. Because of the waiver, 18 U.S.C. § 3041 (1958) is

not here involved (and see Reviser's Note).

compulsion or interference in this connection.

I certify that the above was signed in my presence, and that this agreement has been made without compulsion of the authorities here, and upon the free desire of myself, Willie Lee Short, Jr.

Signed: Willie Lee Short, Jr.
Witnesses:
L. W. Kelly, D.S.
J. T. Turner, D.S."

Informed by telephone that Short had signed that waiver, O'Bryant on September 15, 1962 flew from Washington to Raleigh.

Some of my colleagues have decided that when the jailers in North Carolina allowed O'Bryant to see Short, the latter "became" the prisoner of the District of Columbia officer. They say that from the time O'Bryant made a notation of "arrested" on the Municipal Court warrant of August 10, a period of unnecessary delay began to run. Thus, they conclude, the subsequent confession was invalidly extracted and could not lawfully be used against Short.

In my view the lieutenant might just as well have writen "arrested" on a laundry check. The local magistrate's warrant had no validity whatever in Raleigh. It could not serve to authorize O'Bryant to take Short before the nearest federal judge or commissioner or anywhere else. It could not make Short the "prisoner" of O'Bryant. My colleagues observe of the lieutenant, "He well knew that Short was to be held. He had no authority to release him." Of course he did not. Short remained in the jail subject to its discipline until the following day when the state authorities released Short for his return to Washington. Under such circumstances Rule 40 had no application to this case for the simple reason that Short had agreed to come back here with O'Bryant. On that account Rule 40 can not predicate exclusion of the confession.

O'Bryant advised Short of his rights. A deputy sheriff testified to his presence when O'Bryant interviewed Short, that Short was advised of his rights, that any statement he made might be used for or against him, and that Short answered voluntarily, without coercion and without any promises or inducements. Indeed, the record shows, O'Bryant also told Short "he didn't have to tell me anything if he didn't want to tell me, that I wasn't even going to request that he tell me something if he did not want to tell me."

Within two or three minutes, Short began answering questions about four different crimes.

O'Bryant arranged to have Short's family come to the jail. He gave each of them a copy of Short's statements. He read the statements to the family. He asked if there was any word that he was reading that was different from the words on their copies. He asked Short if the confession were true, and he said it was. Short's wife, his sister and the latter's fiance, McCloud, heard Short acknowledge the truth of the statements. All testified to the same effect at the hearing. Short, however, denied that O'Bryant had read the confession to him in their presence.

Such was the record, but in much greater detail, upon which the experienced trial judge based his rulings. He said:

"I do not believe Short's testimony. He made it clear beyond a shadow of a doubt, in my mind, that he was simply not telling the truth about it. I didn't believe anything that he said. He even contradicted his own wife. He contradicted his own sister. And, in some measure, he contradicted McCloud. And then to say, when asked on cross-examination about his testimony before the grand jury, that he gave answers which are exactly the opposite of the answers which the grand jury minutes, so much of it as was read to him, showed he did—he said 'no' when the record shows that he said 'yes,' or he said 'yes' when the record shows that he said 'no'—I just don't believe it."

The specious contentions before the District Court were demolished by the facts as outlined and by the conclusions reached by the judge. The latter obviously perceived before him a wary sophisticate who knew precisely what he was doing as he advanced his various claims. Thus the judge correctly ruled that the motion to suppress the confession should be denied.

This was not a situation where there "was a working arrangement between the federal officers and the sheriff," as in Anderson v. United States.[2] On the contrary, the state case had no connection whatever with the robbery charges in the District of Columbia. O'Bryant simply confronted Short with the evidence against him and the confession followed. As did the Supreme Court in Coppola v. United States,[3] we should affirm.[4]

It is obvious from the transcript that O'Bryant in Raleigh and the prosecutor before the grand jury were particularly interested in what help Short might give in clearing up certain crimes not here considered. Perhaps his testimony predicated the indictment of others. Perhaps as to such other offenses, Short hoped to exculpate himself; indeed for all we are shown, he may have done so.[5] When Short appeared before the grand jury, the Assistant United States Attorney said:

"Q. Mr. Short, I want you to know that you are before the Grand Jury and that we are going to ask you some questions. I want you to know you don't have to say anything. If you do tell us anything your statement is being taken down and can be used against you at any future

trial arising out of any matter that we talk about here, or any other matters. Do you understand that?

"A. Yes.

"Q. Knowing that you still want to come in here and testify?

"A. Yes."

Short testified at the District Court hearing that he had wanted to go before the grand jury.[6] "Because I know I hadn't did anything." The next questions and answers disclosed in the transcript read:

"Q. Well, now, did you tell them you had done anything when you testified?

"A. No, I didn't.

"Q. You denied everything when you testified?

"A. That's right."

As noted above, the trial judge refused to believe Short. He perceived that Short had lied when he so testified, in the foregoing respects as in every other contested instance. But Short's testimony provides the sort of record upon which my colleagues rest. So they are able to say "We think taking him before the grand jury *without his consent* and asking him anything violates his privilege." (Emphasis added.) The transcript is exactly the opposite. Elsewhere they add: "Moreover, in our view Short gave no consent * * * to be taken before the grand jury on October 2. His actual state of mind is irrelevant, since a state of mind that is not expressed or implied by words or conduct has no legal effect." Of such stuff are dreams made. My colleagues even state—as they are bound to do—that Lieutenant

2. 318 U.S. 350, 356, 63 S.Ct. 599, 602, 87 L.Ed. 829 (1943).

3. 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (1961); and see Papworth v. United States, 256 F.2d 125, 127 (5 Cir.), cert. denied, 358 U.S. 854, 79 S.Ct. 85, 3 L.Ed. 2d 88 (1958).

4. Cf. Morgan v. United States, 111 U.S. App.D.C. 127, 294 F.2d 911 (1961).

5. Johnson, who had participated with Short and others herein named in the July 28

robbery and the August 3, 1962 robbery attempt, entered a pretrial plea of guilty and testified for the Government. One indictment naming Johnson was then dismissed.

6. He certainly had received Rule 5 advice from the committing magistrate, and, no doubt, similar caution from the attorney who appeared with him at the preliminary hearing.

O'Bryant had "asked Short whether he wanted to testify before the grand jury and Short said he did. Short denied this. We accept O'Bryant's testimony. But, if *as Short claimed,* he did not know what a grand jury was, he may well have thought O'Bryant meant a trial jury." (Emphasis added.) Not a shred of record evidence entitled to credence supports any such conclusion; the position taken by my colleagues has no more foundation in this case than their willingness to write the record as they want it to read. Only thus can they predicate their desire to reach the conclusion that Short's appearance before the grand jury was "compelled." If the findings of a District Judge who has heard all the witnesses and observed their demeanor are to have no greater significance than my colleagues would accord them here, preliminary hearings become a mere exercise in futility.

The pronouncements of some of the majority upon so grand a scale sound in sheer vacuity. In any event, after everything has been said, the plain fact is that *no testimony given by Short before the grand jury was offered at trial.* The judge actually recessed the hearing early so that defense counsel might examine the grand jury minutes and be prepared to indicate therefrom any basis of possible prejudice. No such proffer followed. The judge had made it clear that he was not interested in the mass of the testimony as to *other* crimes. He wanted only such material as had a bearing on *this* case.

The indictment was valid even without Short's confession and even if based only on O'Bryant's testimony. The trial judge correctly followed what the Supreme Court had said in Costello v. United States [7]:

"If indictments were to be held open to challenge on the ground that there was * * * incompetent evidence

before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency * * * of the evidence before the grand jury. This is not required by the Fifth Amendment."

The trial judge properly ruled that the motion to dismiss the indictment must be denied, and we should affirm his ruling.

When one realizes how many thousands of criminal cases have reached the federal courts and again, how many of those in turn have reached the Supreme Court, it seems strange that only now does the "right to counsel" take the turn my colleagues give it. Speaking of Short's having said that he wanted to testify before the grand jury, my colleagues say, "In any case, willingness on September 16 is not willingness on October 2. There is nothing *to show* that anyone even thought on October 2 *that Short was then willing* to be taken to the grand jury and interrogated." (Emphasis added.) The Assistant United States Attorney thought so; he even asked Short about it, *supra.* Short thought so; he told the grand jury he wanted to testify (text *supra*).

But in the meantime, Short had appeared before the committing magistrate on September 17, 1962. An attorney had then been appointed to represent him at the preliminary hearing. Notwithstanding, my colleagues say "Short's Sixth Amendment right 'to have the Assistance of Counsel for his defense' *was withheld.*" Apparently they mean to imply that the right was "withheld" by the Government. At another point my colleagues say "By failing to inform counsel of the impending examination, *the prosecution deprived Short* of his as-

7. 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956); and see Lawn v. United States, 355 U.S. 339, 349, 350, 78 S.Ct.

311, 2 L.Ed.2d 321 (1958); Holt v. United States, 218 U.S. 245, 247, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).

sistance at a crucial time and greatly to Short's prejudice." [8]

So far as appears Short's counsel may well have advised him that his best chance to secure ultimate consideration at the hands of the prosecution or the sentencing judge depended upon the degree of cooperation he might extend in connection with the other crimes then under investigation. Such advice is not unusual. Granting that my deduction is sheer speculation in view of the state of the record, it is at least as valid as the supposition voiced by my colleagues that it is "unlikely that Short would have repeated his former confessions there if he had been counseled." I do not agree that an attorney would have told Short that his voluntary confession was "illegally obtained." Following the law, at least before the present majority opinion, he would have said "The confession may be offered at trial. Your best bet is to cooperate—like Johnson." [8a]

Mr. Justice Brennan observed as late as this June,

"[T]oday the *admissibility* of a confession in a state criminal prosecution *is tested by the same standard applied in federal prosecutions* since 1897, when, in Bram v. United States, 168 U.S. 532 [18 S.Ct. 183, 42 L.Ed. 568], the Court held that 'In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that *no person "shall be compelled* in any criminal case to be a witness against himself." ' *Id.*, 168 U.S. at 542, [18 S.Ct. 183]." (Emphasis added.) [9]

Here, of course, it was clear that Short had not been *compelled* to incriminate himself. Let it be noted that my colleagues have not decided that Short's confession was involuntary; rather, they have sought to resolve its admissibility on alleged noncompliance with Rule 40.

Be that as it may, we do not find my colleagues saying that Short's Sixth Amendment right had been "withheld" because he had sought and had been denied an attorney. They seek to support their conclusion by a totally artificial reference to Escobedo v. Illinois.[10] But let us see what the Court there said:

"We *hold*, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, *the suspect has requested and been denied an opportunity to consult with his lawyer*, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution * * * and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (Emphasis added.)

If the District Judges seek to understand the opinion of my colleagues in terms of Massiah v. United States [11] cited by my colleagues, let me point to fundamental variances there from the situation here shown. In that case, Massiah had been indicted, had counsel and was at liberty on bail as the Government authorities well knew. Even so, acting in concert with a co-defendant who with-

---

8. Italics mine.

8a. See note 5, *supra,* as to the disposition of Johnson.

9. Malloy v. Hogan, 378 U.S. 1, 7, 84 S. Ct. 1489, p. 1493, 12 L.Ed.2d 653 (1964).

10. 378 U.S. 478, 490–491, 84 S.Ct. 1758, 1765 (1964).

11. 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

out Massiah's knowledge had agreed to become a witness for the Government, the authorities concocted a deliberate and surreptitious subterfuge. They planted in the co-defendant's car broadcasting equipment to pick up Massiah's conversation. Then with receiving equipment in a following car, they overheard whatever Massiah had to say when not aware that he was being victimized by the Government-conceived plot for his interrogation. He had not been put on notice that what he was saying was being recorded by federal agents.

Even Powell v. Alabama [12] does not help my colleagues. They point to the sentence reading, "He requires the guiding hand of counsel at every step in the proceedings against him." But in *Powell*, the prisoners had been arraigned without counsel immediately upon the return of the indictment. Six days thereafter the trials were commenced, and no counsel representing the defendants appeared when the case was called for trial. Thus, the Court was saying, during the most critical period of the proceedings "from the time of their arraignment until the beginning of trial, when investigation and preparation were vitally important, the defendants did not have the aid of counsel." [13] Those were the steps of the proceedings which the Court so obviously had in mind.

We have made it clear that if an accused be without counsel at a preliminary hearing, a plea of guilty made without warning or advice can not be used in evidence against him.[14] My colleagues do not so much as mention our own well established rule or the case in which it is stated, Council v. Clemmer.[15] There a unanimous court held specifically that there is no constitutional requirement that the accused be represented by counsel at a preliminary hearing where he pleads not guilty. But Short was so represented in this case. This court also pointed out in *Clemmer*, that Rule 44 of the Federal Rules of Criminal Procedure in providing for representation by counsel "at every stage" is intended to apply only to proceedings in court, and Short had counsel in all court proceedings.

It may respectfully be suggested that no Sixth Amendment right was "withheld" from Short, by anybody. Much less does it appear that the prosecution in any way had negated Short's rights by "failing" to inform the counsel after the preliminary hearing that Short had wanted to appear before the grand jury, and thereafter had willingly appeared. Again the *facts* in this case speak loudly and clearly for Short said so himself. Perhaps at *this* point, my colleagues do *not* believe him!

In recapitulation, we find our majority colleagues unable to say that some automatic rule of exclusion must bar Short's voluntary confession in North Carolina.

So a theory is fashioned to apply where state officers on a completely independent state charge arrest their wanted accused at a point more than 100 miles from Washington. If that state prisoner agrees to dispense with removal proceedings and to return to this District whence he is a fugitive, a Metropolitan Police officer who goes to get the man must not permit the accused voluntarily to confess his crime until after the officer swears out a complaint, has the man arrested and then presented before a federal judge or commissioner. Failure so to

12. 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L. Ed. 158 (1932).

13. Price v. Johnston, 144 F.2d 260, 262 (9 Cir.), cert. denied, 323 U.S. 789, 65 S.Ct. 312, 89 L.Ed. 629 (1944), rehearing denied, 323 U.S. 819, 65 S.Ct. 558, 89 L.Ed. 650 (1945); we have so interpreted the Powell dictum. Edwards v. United States, 78 U.S.App.D.C. 226, 228, 139 F. 2d 365, 367 (1943), cert. denied, 321 U.S. 769, 64 S.Ct. 523, 88 L.Ed. 1064 (1944).

14. Wood v. United States, 75 U.S.App.D.C. 274, 287, 128 F.2d 265, 278, 141 A.L.R. 1318 (1942); there Mr. Justice Rutledge reviewed many facets of the counsel problem in a classic opinion which underlies in substantial part the language now appearing in FED.R.CRIM.P. 5.

15. 85 U.S.App.D.C. 74, 177 F.2d 22, cert. denied, 338 U.S. 880, 70 S.Ct. 150, 94 L. Ed. 540 (1949).

comply with Rule 40(b) will bar the confession here, my colleagues say. Moreover, not only will Short's conviction be reversed but those of all co-defendants receive like treatment.

Some of my colleagues would take a new tack in working up a "right to counsel" bar. They realized that the record could not belie Short's expressed willingness to testify before the grand jury, and that the committing magistrate, the police and the Assistant United States Attorney had warned Short against self-incrimination. They knew, as our law requires, that Short had counsel at the preliminary hearing and again at trial. So they conclude that the indictment must be dismissed because the Government "prevented" Short from consulting *some* attorney. To achieve *that* result they had to reason that the attorney they had in mind was the one first appearing for Short!

In part to bolster such syntheses, some of my colleagues cite Lee v. United States.[16] Let me note in part what was there said by Circuit Judge Hutcheson, dissenting. [17] He spoke of the "personal views of the majority judges" and others who wish to change settled principles governing trial and error in a criminal case by "introducing new and strange doctrines." In their view, as he put it,

> "a convicted defendant is regarded *as a personal ward of the appellate courts and instead of being compelled, as statute and rules provide, to show for reversal that his trial was attended with prejudicial error*, he is required only to invoke and enlist in his behalf the supposed supervisory powers and personal interest of the Court of Appeals, or enough of its judges to carry the day for him." (Italics in original.)

The facts in this case after all are the best answer to my majority colleagues— as to points where they are a majority. I agree with Judge Prettyman and join his opinion where my doing so will sus-

tain his position. At all events, I would affirm.

I am authorized to state that Senior Circuit Judge Prettyman and Circuit Judges Wilbur K. Miller and Bastian join in this dissent.

BURGER, Circuit Judge:

I agree in large part with what Judge Prettyman has expressed. Compare Spriggs v. United States, 118 U.S. App.D.C. 248, p. 252, 335 F.2d 283, p. 287 n. 1 (dissenting opinion). However, I desire to make several points separately because of seeming internal conflicts in what is the operative holding of the majority under Part VI. I do not read Judge Edgerton's opinion as holding that an indictment cannot rest on a confession simply because that confession would be inadmissible at trial under Rule 5(a) and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). As I read it, the remand should be construed as meaning that the District Court is now to determine what evidence the Grand Jury had other than Short's own testimony. In sum, the written statements of Short could afford an adequate basis for an indictment without reference to their admissibility *at trial*; the majority has not decided otherwise. It is Short's *uncounseled testimony* to the Grand Jury, rather than his written confession, to which the majority objects. However, I agree with Judge Prettyman that a remand to accomplish the stated objectives is pointless and that any basis for such remand was waived by appellant Short's counsel in the District Court. (See discussion, Point VI, opinion of Judge Prettyman.)

If we are prepared to say that an uncounseled accused is not to be taken before a Grand Jury without first being afforded court appointed counsel (if indigent), we ought to declare this as a requirement; the supervisory powers of this court and the District Court over the administration of justice are broad

---

16. 322 F.2d 770, 777 and 778 (5 Cir. 1963).

17. *Id.* at 779.

enough to do so. Moreover, our objective should be fundamental fairness to an accused rather than added negative techniques which frustrate the administration of justice and produce multiple retrials until at last the court dismisses the indictment for denial of a speedy trial. See, *e. g.*, Marshall v. United States, 119 U.S.App.D.C. ——, 337 F.2d 119.